**SO ORDERED.**

**SIGNED this 17 day of December, 2012.**

_____
**Randy D. Doub**
**United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

IN RE:

LICHTIN/WADE, LLC,                    CHAPTER 11
                                      CASE NO. 12-00845-8-RDD
    DEBTOR

ORDER DENYING DEBTOR'S
MOTION TO DESIGNATE THE VOTES OF ERGS II, L.L.C.
AS SUBMITTED IN BAD FAITH PURSUANT TO 11 U.S.C. § 1126(e)

Pending before the Court is the Motion to Designate the Votes of ERGS II, L.L.C. as Submitted in Bad Faith Pursuant to 11 U.S.C. § 1126(e) (the "Motion") filed by Lichtin/Wade, LLC (the "Debtor") on August 10, 2012 and the Objection of ERGS II, L.L.C. to Debtor's Motion to Designate the Votes of ERGS II, L.L.C as Submitted in Bad Faith Pursuant to 11 U.S.C. § 1126(e) (the "Objection") filed by ERGS II, L.L.C. ("ERGS") on September 4, 2012. The Court conducted a hearing on this matter on October 31, November 7, and November 15, 2012 in Wilson, North Carolina.

**BACKGROUND**

The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on February 2, 2012. The Debtor owns two office buildings located in Raleigh, North Carolina and operates as a debtor-in-possession. First Amended Disclosure Statement at 7, *In re Lichtin/Wade,*

*LLC*, No. 12-00845-8-RDD (Bankr. E.D.N.C. July 19, 2012). The two office buildings are Class A office buildings. *Id.* "Each building has approximately 100,000 square feet of rentable space. Each building is approximately 90% leased." *Id.* In addition, the Debtor owns vacant land consisting of approximately twelve acres which is approved for three additional office buildings. *Id.* Prior to the date of filing, the Debtor and Branch Banking and Trust Company ("BB&T") entered into four promissory notes (the "Secured Notes"),[1] secured by all of the Debtor's real property, assignment of rents, and certain of the Debtor's personal property. The four Secured Notes matured on December 15, 2011.

On March 27, 2012, BB&T entered into an agreement with ERGS, whereby ERGS purchased from BB&T all of its rights, title, and interests in and to the Secured Notes. On May 2, 2012, ERGS filed Proof of Claim No.10 in the secured amount of $39,236,631.03 representing principal, interest, and fees. On May 29, 2012, the Debtor filed the Objection to Claim, objecting to ERGS's Proof of Claim. On August 8, 2012, the Court entered an order determining that ERGS's claim was to be treated as a secured claim in the amount of $38,390,000.00, and an unsecured claim in the amount of $673,661.91.

---

[1]

|        | Dated              | Original Principal Amount |
|--------|--------------------|---------------------------|
| Note 2 | May 3, 2007        | $15,035,000.00            |
| Note 3 | August 31, 2007    | $5,665,512.00             |
| Note 4 | August 31, 2007    | $16,800,000.00            |
| Note 7 | September 13, 2011 | $1,950,000.00             |

On April 24, 2012, the Debtor and ERGS entered into a stipulation agreement agreeing and stipulating that the real property owned by the Debtor securing ERGS's claim shall be valued at $38,390,000.00.

On March 26, 2012, the Debtor filed the Plan of Reorganization and Disclosure Statement. On April 11, 2012, the Debtor withdrew the Plan of Reorganization and Disclosure Statement and re-filed the Plan of Reorganization and the Disclosure Statement. On July 19, 2012, The Debtor filed the First Amended Plan and First Amended Disclosure Statement. On October 15, 2012 the Debtor filed the Second Amended Chapter 11 Plan and the Supplement to the First Amended Disclosure Statement. ERGS filed an objection to confirmation of the Debtor's Second Amended Plan of Reorganization on October 22, 2012.

On May 29, 2012, ERGS filed notices as to the transfer of the Class 11 claims of Tri Properties, Inc. and MCC Realty Group, Inc., two of the four claims in Class 11 - Tenant Broker Claims.

The Debtor filed the Motion on August 10, 2012 and ERGS filed the Objection on September 4, 2012. For purposes of the Motion and the Objection the Court will analyze the Second Amended Chapter 11 Plan and the First Amended Disclosure Statement and the Supplement to the First Amended Disclosure statement for purposes of the Motion and the Objection.[2]

On July 17, 2012, ERGS filed its Motion to Terminate Exclusivity, seeking termination of the exclusive periods relating to both filing a plan and soliciting a plan, which motion attached a draft of ERGS's proposed creditor's plan. On July 25, 2012, the Debtor filed a motion to extend

---

[2]Section 1127 of the Bankruptcy Code provides a plan proponent may modify a plan any time before confirmation. The modified plan then becomes the plan and is to be treated as the original plan.

exclusivity, but only with respect to extending its exclusivity for soliciting votes with respect to the Amended Plan. On July 26, 2012, ERGS filed a disclosure statement with respect to its proposed draft creditor's plan. ERGS subsequently filed the Creditor's Plan of Reorganization for Lichtin/Wade, LLC Pursuant to Chapter 11 of the Bankruptcy Code ("ERGS Plan") and the Disclosure Statement for Creditor's Plan of Reorganization for Lichtin/Wade, LLC Pursuant to Chapter 11 of the Bankruptcy Code ("ERGS Disclosure Statement") on July 27, 2012. The Court conducted a hearing on the Motion to Terminate and the motion to extend exclusivity and later entered a scheduling order extending the Debtor's exclusive period to solicit votes with respect to the Amended Plan. On September 4, 2012, ERGS withdrew the ERGS Plan and the ERGS Disclosure Statement.

As to ERGS, the Second Amended Chapter 11 Plan (the "Plan") provides ERGS shall be allowed a secured claim of $38,390,000.00. The Plan proposes to amortize ERGS's claim over thirty (30) years with interest at 5%. The Plan provides the note will mature in five (5) years.[3]

The Debtor moves the Court to "designate" all votes cast by ERGS in this case as submitted in bad faith, and disallow such votes pursuant to Section 1126(e). The Debtor contends that ERGS is acting not as a creditor in this case, but instead is acting for its own ulterior motive of obtaining control of the Debtor's business operations. The Debtor argues that subsequent to ERGS purchasing the Debtor's loans from BB&T, it has engaged in conduct that shows it is attempting to obtain

---

[3]The First Amended Plan filed on July 19, 2012 provided ERGS shall be allowed a secured claim of $38,390,000.00. The Plan proposed to provide for monthly payments of interest in the amount of $159,958.33 with interest at 4.75%. Additionally, the Debtor was to pay the sum of $10,000.00 per month, which shall be credited against the principal balance and on or before January 30th of each year, pay to ERGS the sum equal to 25% of the Net Cash Flow from the preceding year. The Plan provides the note will mature in five (5) years

control of the Debtor's buildings, instead of acting as a creditor in this case. This conduct, the Debtor contends, warrants the extraordinary remedy of disqualifying the votes of ERGS.

In response, ERGS contends that the right of a creditor to vote on a plan of reorganization is a sacred right and a party seeking to revoke that right faces a heavy burden. ERGS argues that under the Debtor's Plan, ERGS would be forced to hold a restructured note inconsistent with current market terms and that as the largest creditor in this case, it has the greatest economic stake and risk. ERGS asserts that it has the right to exercise its own business judgment to protect its own economic interest and the Debtor has not met its heavy burden of showing its votes were not cast in good faith.

## **DISCUSSION**

For a debtor to obtain confirmation of a plan, Chapter 11 generally requires a vote of all holders of claims and interests impaired by the plan. *DISH Network Corp. v DBSD North America, Inc., et al* (*In re DBSD North America, Inc.*), 634 F.3d 79, 101 (2nd Cir. 2011) (citing 11 U.S.C. §§ 1126, 1129(a)(8)). An exception to this requirement is 11 U.S.C. § 1126(e). Section 1126(e) of the Bankruptcy Code provides, "[o]n request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title." 11 U.S.C. § 1126(e).

"Bankruptcy courts should employ § 1126(e) designation sparingly, as 'the exception, not the rule.'" *DBSD North America, Inc.* 634 F.3d at 101 (citing *In re Adelphia Commc'ns Corp.*, 359 B.R. 54, 61 (Bankr. S.D.N.Y. 2006)). The party seeking to designate a vote as submitted in bad faith has a heavy burden of proof. *In re Adelphia Communications Corp.*, 359 B.R. 54, 61 (Bankr. S.D.N.Y. 2006). Creditor's have a fundamental right to vote on a debtor's Chapter 11 plan and

designation of a creditor's vote is a drastic remedy. *Id.* Purchasing claims "for the purpose of securing the approval or rejection of a plan does not of itself amount to 'bad faith.'" *DBSD North America, Inc.*, 634 F.3d at 102 (citing *In re P-R Holding Corp.*, 147 F.2d 895, 897 (2d Cir. 1945); *In re 255 Park Plaza Assocs. Ltd. P'ship*, 100 F.3d 1214, 1219 (6th Cir. 1996)). Mere selfishness or protecting one's own self interest does not give rise to bad faith. *Id.* at 102. Section 1126(e) applies to creditors who are attempting to obtain a benefit to which they are not entitled. *Id.* (citing *In re Figter*, 118 F.3d 635, 638 (9th Cir. 1997)).

The Bankruptcy Code does not define "good faith." Section 1126(e)'s "'good faith' test effectively delegates to the courts the task of deciding when a party steps over the boundary." *Id.* at 101 (citation omitted). Supreme Court and Circuit Court precedents on the "good faith" voting requirement are sparse. *Id.* Courts make the "good faith" determination on a case-by-case basis. *Id.*

The test is "whether a creditor has cast his vote with an 'ulterior purpose' aimed at gaining some advantage to which he would not otherwise be entitled in his position." *In re Gilbert*, 104 B.R. 206, 216 (Bankr. W.D. Mo. 1989) (citing *In re A.D.W., Inc.*, 90 B.R. 645, 649 (Bankr. D.N.J. 1988); *In re MacLeod Co., Inc.*, 63 B.R. 654, 655 (Bankr. S.D. Ohio 1986)). However, not just any "ulterior motive" will be considered an improper motive for purposes of finding bad faith under § 1126(e). *DBSD North America, Inc.*, 634 F.3d at 102 "[M]ost creditors have interests beyond their claim against a particular debtor, and those other interests will inevitably affect how they vote the claim." *Id.*

Here, the Court must determine whether ERGS voted with an ulterior motive aimed at gaining an advantage to which it would not have otherwise been entitled. The ulterior motive which 11 U.S.C. § 1126(e) was intended to target is illustrated in the case *Texas Hotel Sec. Corp. v. Waco*

*Dev. Co.*, 87 F.2d 395 (5th Cir. 1936), *cert. denied sub nom.*, *Waco Dev. Co. v. Rupe*, 300 U.S. 679 (1937). *Id.* The statute which ultimately became §1126(e) was enacted in response to the *Waco* decision. There, Conrad Hilton purchased claims to block confirmation of a plan of reorganization. *Texas Hotel Sec.* Corp., 87 F.2d at 397-99. The plan proposed to give a lease on the debtor's property, which was once held by Mr. Hilton, to a third party. *Id.* at 397. Mr. Hilton's purpose for buying the claim was to "force [a plan] that would give them again the operation of the hotel or otherwise reestablish an interest that they felt they justly had in the property." *Id.* at 398. Ultimately, the Fifth Circuit allowed Hilton's vote as it found no authority in the then existing Bankruptcy Act to disallow the votes. *Id.* at 400. Two years later, Congress enacted the good faith standard for voting. *DBSD North America, Inc.*, 634 F.3d at 103.

Subsequent to the decision in *Texas Hotel Securities Corp.*, other courts have commented on what constitutes a lack of good faith in the context of 11 U.S.C. § 1126(e). The Ninth Circuit in *Fighter* recognized that in the context of § 1126(e), "[i]f a person seeks to secure some untoward advantage over other creditors for some ulterior motive, that will indicate bad faith." *Figter Ltd. v. Teachers Ins. and Annuity Assoc. of Am.* (*In re Figter Ltd.*), 118 F.3d 635, 639 (9th Cir. 1997). There, the debtor asserted the creditor should be precluded from voting its purchased claims because they were not purchased in good faith. *Id.* at 638. The Ninth Circuit noted:

> If a selfish motive were sufficient to condemn reorganization policies of interested parties, very few, if any, would pass muster. On the other hand, pure malice, "strikes" and blackmail, and the purpose to destroy an enterprise in order to advance the interests of a competing business, all plainly constituting bad faith, are motives which may be accurately described as ulterior.

*Id.* at 638 (citing *In re Pine Hill Collieries Co.*, 46 F.Supp. 669, 671 (E.D.Pa. 1942)). The Court went on to acknowledge "the mere fact that a creditor has purchased additional claims for the

purpose of protecting his own existing claim does not demonstrate bad faith or an ulterior motive." *Id.* at 639.

The Second Circuit in *Dish Network Corp. v. DBSD North America, Inc.* (*In re DBSD North America, Inc.*), 634 F.3d 79, 101 (2nd Cir. 2011) upheld the bankruptcy court's decision which found that "DISH, as an indirect competitor of [the debtor] and part-owner of a direct competitor, bought a blocking position in (and in fact the entirety of) a class of claims, after a plan had been proposed, with the intention not to maximize its return on the debt but to enter a strategic transaction with [the debtor] and 'to use status as a creditor to provide advantages over proposing a plan as an outsider, or making a traditional bid for the company or its assets.'" *Id.* at 104 (citations omitted). There, the creditor DISH, purchased claims to pursue "its own strategic objective of acquiring [the debtor's] spectrum rights, not toward protecting its claim." *Id.* The spectrum rights were critical to DISH's growth and the acquisition of the claims and "was not a purchase to make a profit on increased recoveries under a reorganization plan." *In re DBSD North America, Inc.*, 421 B.R. 133,136 (Bankr. S.D.N.Y 2009). Instead, DISH "acted to advance strategic investment interests wholly apart from maximizing recoveries on a long position in debt it [held]." *Id.* at 142.

The Bankruptcy Court for the Western District of Pennsylvania found bad faith when a creditor purchased claims after the debtor's disclosure statement was approved in order to block the debtor's plan for the purpose of taking over and controlling the debtor. *In re Allegheny Intern., Inc.*, 118 B.R. 282, 287 (Bankr. W.D. Pa. 1990). The bankruptcy court stated, "Japonica, like Hilton in the *Waco* case, bought a blocking position after the debtor proposed its plan of reorganization. In *Waco*, Hilton's objective was to force Waco to reestablish Hilton's interest in the hotel. In the instant case, Japonica's interest is to take over and control the debtor." *Id.* at 289. In *In re MacLeod Co.*,

8

*Inc.*, the Bankruptcy Court for the Southern District of Ohio designated the creditor's vote when the ulterior motive was to "destroy[] or injur[e] [the] debtor in its business so that the interests of the [creditor's] competing business . . . could be furthered." 63 B.R. 654, 655-56 (Bankr. S.D. Ohio 1986).

Here, the Debtor contends ERGS is acting in bad faith based on an improper ulterior motive based on the following: (1) ERGS was not originally a creditor of the Debtor; (2) ERGS is a direct or indirect competitor of the Debtor; (3) ERGS wants to obtain control of the Debtor's business; (4) ERGS bought claims after the plan was filed to obtain a blocking position on the Debtor's plan; and (5) ERGS filed a competing plan in violation of the exclusivity period, and sought permission to terminate exclusivity to file a competing plan. The Debtor cites to four factors indicating bad faith, including when votes are designed to "(1) assume control of the debtor, (2) put the debtor out of business or otherwise gain a competitive advantage, (3) destroy the debtor out of pure malice, or (4) obtain benefits available under a private agreement with a third party which depends on the debtor's failure to reorganize." *In re Dune Deck Owners, Corp.*, 175 B.R. 839, 844-45 (Bankr. S.D.N.Y. 1995) (internal citations omitted).

ERGS contends that it is owed approximately $39 million and is, by far, the largest secured and unsecured creditor in this single asset real estate case. Because of that, ERGS argues that it was permissible to use its own business judgment to determine that the plans proposed by the Debtor are not in the best economic interests of ERGS. ERGS represents that all of its actions were motivated based on what was in its best economic interest.

The Court holds that the Debtor has failed to carry its heavy burden with respect to whether ERGS rejected and voted against the plan not in good faith.

The Debtor contends that ERGS is a direct or indirect competitor of the Debtor. Specifically, the Debtor argues that ERGS is an affiliate of Archon Group, L.P. ("Archon") and that Archon acts as the servicer for the Debtor's loans. ERGS and Archon are operated out of the same location as ERGS. The Debtor contends that Archon's website states "Archon's group of real estate professionals oversees the management, leasing and disposition activities for all real estate assets. . . . Archon builds value through the acquisition, development, management, financing and disposition of real estate investments." Based on this language, the Debtor contends that Archon is in the same business as the Debtor. Furthermore, the Debtor contends ERGS owns an interest in a direct competitor of the Debtor. The Debtor represents that ERGS is the managing member of ERGS II REO Owner, L.L.C., and that in early 2012, ERGS II REO Owner, L.L.C. purchased six (6) office buildings, all within approximately five miles of the Debtor's buildings.[4]

In response, ERGS contends that the suggestion that Archon and the Debtor are in the same business is not credible. Archon services the Debtor's loans and there is no evidence suggesting that

---

[4] In addition, the Debtor argues that deposition testimony of Craig Boyd indicates that ERGS was a competitor of the Debtor. The testimony is as follows:
   Q. I think you said earlier that you would consider these blue properties competitors of Lichtin/Wade, or would you?
   A. There's a lot of considerations going into whether something's a competitor or not.
   Q. Well, do you consider them competitors or not?
   A. I would consider them competitors, sure.
(Deposition, Debtor's Ex. 48, Page 200, Sept. 26, 2012.)

The next day counsel for ERGS questioned Mr. Boyd regarding his response to the above deposition question. At the deposition, Mr. Boyd stated that he discussed this question with his counsel after the deposition and he felt that the question was confusing and needed clarity. Mr. Boyd went on to explain that he didn't believe the buildings compete with one another. "They may or may not – I don't know – offer similar amenities, characteristics, space, but, you know, that's going to be up to the tenant, and it's going to be a tenant-by-tenant decision." (Deposition, Debtor's Ex. 48, Page 200, Sept. 26, 2012).

the Debtor services real-estate based loans or that the Debtor makes real estate backed loans to third parties. Here, ERGS contends, the Debtor has simply developed two office buildings, owns three additional lots for future development, and uses a third-party affiliate/insider to manage and lease those buildings. Thus, ERGS contends, the argument that Archon and the Debtor are in the same business is not credible.

At the hearing, Craig Boyd, a Vice President with the Archon group, testified that ERGS purchased the Secured Notes because it saw an opportunity for a good investment. Based on an extensive underwriting process conducted by ERGS, it determined that by purchasing the Secured Notes it could recover a profitable rate of return. Further, in Mr. Boyd's declaration, he stated that based on the Debtor's proposed plan treatment, ERGS made the decision to purchase the claims of the tenant brokers in Class 11, to protect its own economic interests. ERGS's Objection, *Declaration of Craig Boyd Regarding Response to Debtor's Motion to Designate Votes Case by ERGS II, L.L.C.* at 4. There were four claims total, but ERGS was only able to acquire two of the claims, which were acquired for less than the par value of those entities filed proofs of claim. *Id.* Additionally, Mr. Boyd states that had "ERGS's only goal been to own the Debtor's real property, it would have been easier and less costly for ERGS to simply have filed a motion to lift stay and seek foreclosure. Instead, ERGS spent significant sums preparing its creditor's plan and the related disclosure statement, which would have given unsecured creditors a real opportunity to get paid." *Id.* at 6.

Mr. Mark Holman, also a Vice President with the Archon group, testified that he was the lead underwriter of the debt acquisition side of the Secured Notes. He testified that his ultimate responsibility within Archon is to find investment opportunities. He testified that ERGS conducted an extensive underwriting process prior to purchasing the Secured Notes. Based on the underwriting

11

process it was determined that the best outcome for ERGS would be for it to foreclose upon the Debtor's property. Although this was the best scenario, Mr. Holman testified that ERGS considered other possibilities that did not involve foreclosure, but those scenarios would not provide the most return to ERGS. He testified that the intent was not to own and control the property, but that ERGS wanted to maximize the return for their investors.

     Mr. Timothy J. Dragelin is a Senior Managing Director in the Corporate Finance Practice as well as a Senior Manager of the Real Estate and Structured Finance Group at FTI Consultant. His firm was retained as counsel to ERGS. He was asked to evaluate the Debtor's First Amended Plan (the "Amended Plan") and First Amended Disclosure Statement (the "Amended Disclosure Statement") filed by the Debtor as well as the Debtor's real property. In his opinion the Amended Plan was not fair and equitable, ERGS was not receiving the indubitable equivalent of its claim and the Amended Plan was not feasible. Mr. Dragelin testified the Amended Plan was not fair and equitable because all the risks involved were being borne by ERGS. The loan at issue is a 100% loan to value loan, which Mr. Dragelin testified would leave 98% of the debt outstanding at the end of the plan period. Mr. Dragelin testified that the triangle real estate market has approximately 29 million square feet of rentable Class A office space. With the total rentable office space constituting approximately 40-50 million square feet. Mr. Dragelin testified that the Debtor currently has 200,000 square feet of office space, 90% of which is already leased. Mr. Dragelin represented that the Debtor's total square footage represents 1% of the market.

     Mr. Harold Lichtin testified on behalf of the Debtor. Mr. Lichtin testified as to the Debtor's real property. Mr. Lichtin testified that the Debtor itself does not have any employees and does not have any contacts with the tenants in the Debtor's buildings. He testified that Lichtin Corporation

is the entity that makes contact with the tenants. Mr. Lichtin represented that each of the Debtor's buildings has approximately10,000 square feet of rentable office space available. He testified that the vacant space is not desirable as it is not located in one single block of space. It is instead located in various 1,000 square foot pockets around the building. Mr. Lichtin testified it is difficult to find a tenant to lease these 1,000 square foot pockets because there is a problem of egress and ingress.

Based on the totality of the circumstances, the Court finds that ERGS purchased claims for the purpose of maximizing its investment and advancing its own economic interest rather than for the purpose of advancing a strategic competitive interest against the Debtor. Here, Mr. Boyd and Mr. Holman testified that ERGS engaged in an extensive underwriting process to determine that purchasing the Secured Notes would be in the best economic interest of ERGS. Unlike in *DBSD North America, Inc.*, the Debtor here does not have much rentable office space and the rentable office space that is available is difficult to lease. *See DBSD North America, Inc.* 634 F.3d at 104. The square footage is positioned in undesirable 1,000 square foot pockets placed in odd areas in the building. This makes it unlikely that the Debtor is posing a direct or indirect competition to any Class A office space owners. While it does appear that ERGS may have purchased claims to allow it to control certain classes to maximize its return, this is not a motive that Court's have found to show a lack of good faith. The Court finds that the Debtor has failed to show that ERGS purchased claims for the purpose of putting it in direct or indirect competition with the Debtor.

Next, the Debtor contends that even if ERGS was not a direct or indirect competitor of the Debtor, it is attempting to take control of the Debtor and this evidences bad faith. Specifically, the Debtor argues that ERGS filed its own plan which proposes that the Debtor's buildings and vacant land be transferred to ERGS, free and clear of all liens, allowing ERGS to take complete control of

the Debtor's business and everything necessary to continue to operate it going forward. In response, ERGS contends that in its business judgment, it determined that confirmation of the Debtor's Plan would be a worst case scenario for ERGS. ERGS contends it was entitled to protect itself from that outcome. ERGS represents this conclusion was based on the fact that the Debtor's Plan of Reorganization and Disclosure Statement and the Debtor's First Amended Plan and First Amended Disclosure Statement:

> (i) are not economically feasible, (ii) are not fair and equitable to ERGS, (iii) are not providing ERGS the indubitable equivalent of its claim, (iv) saddle ERGS with all of the risk of performance/failure, (v) permit insiders to continue to extract substantial cash from the Debtor through well-above-market management fees, (vi) propose terms for a restructured note that are substantially below market, (vii) provide no meaningful assurance as to the eventual repayment of unsecured claims (the Amended Plan proposes to pay these out over ten years), (viii) violate the absolute priority rule by impaired unsecured creditors while permitting the current members to retain 100% of the equity, and (ix) would likely result in a default by the Debtor at a maturity because the proposed loan structure would require no meaningful principal reduction.

ERGS's Objection at 14.[5]

Based on the totality of the circumstances, the Court finds that ERGS was motivated primarily to improve its plan treatment rather than to take complete control of the Debtor's business. Based on the testimony of Mr. Boyd, Mr. Holman and Mr. Dragelin, ERGS determined that the Debtor's proposed plan was worse for ERGS as the proposed treatment was not fair and equitable. For this reason, Mr. Boyd testified, ERGS filed its own plan. The Court finds that the Debtor has failed to meet the heavy burden of proving that ERGS acted in bad faith. *In re Marin Town Center*, 142 B.R. 374, 379 (N.D.Cal. Feb. 18, 1992) (noting that a "vote cannot be said to have been cast in

---

[5]ERGS has also raised questions regarding various prepetition transfers from the Debtor to various insider entities.

bad faith simply because it was voted for the purpose of blocking confirmation of a reorganization plan. In fact, rejection of a plan by 'a party, largely interested in the Debtor before his acquisition of controlling rights, who withholds consent to a plan primarily because he believes its consummation will be more injurious to his investment in the [d]ebtor than liquidation, meets the standard of good faith'"(citation omitted)).

In addition, the Debtor asserts that ERGS purchased its claims after the Plan was filed to obtain a blocking position on the Debtor's Plan and this constitutes bad faith. ERGS responds that based upon its belief that the Debtor improperly manipulated the classification of claims and treatment of creditors in the original plan, it purchased claims of certain tenant brokers to protect its economic interest. Accordingly, ERGS contends it attempted to acquire the claims of all the tenant brokers owed money by the Debtor, although only two tenant brokers accepted offers from ERGS. Here, based on the evidence and the testimony of Craig Boyd, ERGS's motive in purchasing claims was to protect its economic interest. The Court finds the mere fact that ERGS purchased claims to protect its own interest does not demonstrate bad faith. *See In re Figter, Ltd.*, 118 F.3d at 639.

Further, the Debtor contends that because ERGS was not originally a creditor of the Debtor and approximately fifty-three days into the case purchased the Debtor's obligations from BB&T, it cannot be seen to be voting against the Plan in order to protect its investment. The Debtor contends, if ERGS is concerned with the return on its investment, it should not have purchased the obligations of a Chapter 11 Debtor. In response, ERGS acknowledges that it had no pre-existing interest in the Debtor or its case pre-petition, but that does not equate to bad faith. ERGS contends that claims are bought and sold in bankruptcy cases on a daily basis throughout the country and for

the Debtor to suggest that such a fact equates to bad faith ignores reality and case law. ERGS cites to *In re Marin Town Center*, 142 B.R. 374, 379 (N.D. Cal. 1992) (holding that an investor that purchased the claim of a secured creditor after the debtor filed for bankruptcy was not in bad faith. Noting that ruling otherwise, would give investors little incentive to purchase claims from a creditor in bankruptcy.)

The Court finds that even though ERGS had no pre-existing interest in the Debtor prior to its purchase of the claims, ERGS is still entitled to protect its own self interest and this does not show bad faith.

## CONCLUSION

Based on the totality of the circumstances, the Court finds that Debtor has failed to carry its heavy burden of proof to show that ERGS is an entity whose rejection of the Plan was not in good faith. Therefore, ERGS shall not be designated as an entity not voting in good faith. The Motion is **DENIED**.

**SO ORDERED**.

END OF DOCUMENT